## GLAZE *v.* THE STATE.

1. The court did not err in admitting in evidence the ordinance of the Town of Center, on the ground that there was a pencil interlineation therein of the language, " or under the influence of whisky," it being shown that the interlineation was made before the ordinance was adopted.

(*a*) This ordinance was not inadmissible on the ground that it was irrelevant, it being pertinent to the issue whether the arrest of the defendant by the town marshal was illegal.

2. The court did not err in failing to charge the law of manslaughter.

(*a*) While generally to slay a person who, without a warrant, is seeking to arrest another for a misdemeanor, where the motive of the slayer is merely to avoid arrest, is manslaughter and not murder, it is murder for one to kill an officer to prevent the latter from lawfully arresting the slayer.

(*b*) A town marshal has a right without a warrant to arrest a person violating a criminal municipal ordinance, the violation occurring in his presence; and a constable of this State has authority without a warrant to arrest a person violating a penal statute of this State in his presence.

3. There was no evidence that one of the jurors was related to the deceased within the prohibited degrees.

4. The verdict is supported by the evidence.

No. 3858. NOVEMBER 17, 1923.

Indictment for murder. Before Judge Fortson. Jackson superior court. June 9, 1923.

Willis Glaze, Will Dyer, and Harvey Tinch were jointly indicted for the murder of Fred Crawford on November 12, 1922, in Jackson County. Glaze alone was tried, and was found guilty, with a recommendation. The facts were as follows: Crawford was marshal of the Town of Center, and bailiff of the district in which Center is located. The defendants came into town in an automobile and got out in front of the depot. The marshal testified that the defendants were drinking, but were not drunk enough to be locked up. They went down in front of the church. An officer of the church testified that the defendant seemed to be very much under the influence of whisky; that she went to Crawford

and told him there was a man drunk near the church, and asked the marshal to get the man away, as it looked like there might be trouble, and the man should be gotten away from the church before Sunday-school and church service. The mayor testified that this church officer told the marshal that the defendants were "raising cain, and they could not hold Sunday-school." The mayor could hear the defendants, but could not understand what they said. The marshal arrested Glaze, who resisted arrest and struck at the marshal with his fist. They came up to the mayor to know what the bond would be. The mayor told the marshal to take a $25 cash bond or lock Glaze up. J. W. Johnson testified that he was in front of his store when the defendants drove up. They were about drunk. They got out and asked him if he knew where one Reynolds lived. He tried to tell them, but they seemed not to understand, and turned off. Glaze was drunker than the other defendants. They went down in front of the church, and one of them stopped at the side of the church. Mrs. Chandler came out of the door and started up where he was standing, faster than usual. She said she wanted the marshal to arrest a drunk man at the church and take him away. He called the marshal and told him what she had said. The marshal said: "The defendant is drunk, and I will have trouble with him. I have not got my gun." The witness went home and got his gun and gave it to the marshal. The marshal put his hand on defendant's shoulder, and defendant tried to fight, hitting at the marshal and jerking back. The marshal held him and hollered to Grady Osborn for help. Osborn ran up, and the defendant seemed all right. The marshal then brought the defendant up in front of the store of witness. The mayor told the marshal to let defendant make a $25 cash bond. The other defendants came up, got in their Ford, juggled a little, and started towards Athens. They went about 50 yards, and came back. Glaze and the marshal were talking about the bond. The defendant said he had $5 but not $25, and the marshal said he would have to lock him in the calaboose. Defendant cursed and said they would have to try him or turn him loose. The marshal said they would have to wait until the next day, as it was Sunday. All the defendants were pretty drunk, but Glaze was the drunkest. The marshal and the defendant went 50 yards up the street, and the other defendants overtook them in the car. The marshal and the defendant

got in the back seat, and they went towards Commerce. In four or five minutes some one said those fellows knocked Crawford in the head.

Carl Hayes testified that he saw Crawford knocked off of the car. He looked out towards Crawford's house. A car was there. Crawford and another man were standing there; he heard loud voices, but could not understand what was said. Finally the defendant came around the car and Crawford with him. The defendant put his foot on the running-board and his hands on the door. Crawford and defendant stood there like they were talking. All at once the motor speeded up, and the defendant got in the car, and Crawford swung on the running-board. Crawford grabbed at the defendant, who struck Crawford with a stick on the breast. The defendant hit him twice more. Crawford leaned over, and the defendant struck him again. Crawford then " kind of " struck back, and when he did he sank and the car carried his feet out from under him. Crawford seemed to be grabbing at the defendant, and defendant seemed to be punching him. After Crawford fell to the ground the car speeded up, and the persons in it did not stop to see what had become of Crawford. The road was a good firm one, and the car was going fast and was about 165 yards from the witness when Crawford fell off. When witness reached Crawford, the latter was lying in the road, and appeared to be unconscious. He fell off the instant he was hit. Looks reasonable that the lick would have caused death. The defendant raised up and hit him.— J. P. Johnson Jr. testified that he was 50 or 75 yards from where the car was standing. Saw the man in the back seat (defendant) hit Crawford, who was standing about the middle of the running-board on the right-hand side. Defendant first hit him on the breast with his fist; and when he stooped over, it looked like he had something in his hand, when defendant hit him the last time and he fell off the car.—The sheriff testified that he was called by telephone from Commerce to come for the defendant, and went after him. Defendant was sober at the time, but had been drinking pretty heavily and was still under the influence of whisky to some extent. He found a piece of iron pipe in the car. It looked like a piece of crank-shaft. This was in a car in which they arrested another man whom they had in the calaboose.— Mark Bailey testified: He arrested Will Dyer, who was in an old Ford car. He

found a spring leaf, a piece of pipe about eight or ten inches long, a spark-plug wrench, a kind of hammer-shaped wrench, and three liquor cans between the front and back seats of the car. Either piece of iron was an instrument that might have produced death.

Harvey Tinch testified for the State: Dyer, Glaze, and Connie Weaver went with him to Center in his car. They got out at the depot. Dyer inquired for Henry Reynolds, and they said he lived at the right of the church. Glaze went down near the church and talked to a man in a buggy. Somebody called out, and he looked, and Crawford had hold of Glaze. He went and asked what the trouble was, and Crawford said they accused Glaze of being drunk, but Crawford could not say whether he was drunk or not. Crawford said they would go to the mayor to see about a bond. The mayor said $25, and defendant said he had only three or four dollars and that was not enough, but his brother-in-law would make bond for him in Homer, and asked Crawford to go up there with him. Defendant and Crawford started towards the latter's house. The others overtook them, and they got into the car. Crawford and Glaze got out at Crawford's house. Witness told defendant they would be back, and for him to stay there. They started off at a pretty good speed, looked back, and Crawford and defendant were both on the car. Just then Crawford fell off; witness did not see any one hit him; thinks he would have known it he had been hit. Defendant had a piece of iron; did not see him hit a lick. After Crawford fell off, defendant said to go on, and witness did. At the first patch of woods witness said they ought to separate, and Glaze got out; and later witness got out and told Dyer to carry his car to Dyer's house. Witness went through the woods. — Will Dyer testified that they started up to Crawford's house, where Glaze was to wait until they could go to Glaze's brother-in-law to arrange a bond. "They got in the car and rode with us up to the deceased's house and got out." There had been no disturbance. Glaze got on the back seat, and the deceased on the running-board just back of witness. Tinch, put his hand around witness, and somebody raised up and said to push him off; it was Tinch or Glaze. Never heard any lick. Deceased fell off as he looked around.

Deceased was unconscious when found. A bruise was on the back of his head, slightly to the right — a large knot. There was

a depression in the flesh, but the skin was not broken. One eye was dilated and the other contracted. Outer part of skull had a linear fracture. He died of concussion of the brain.

The defendant made the following statement: "That day we went down there we were drinking; I was drinking and the rest of them were drinking some. I went down near where they said was a church. I never noticed it being a church; just went off down the road, and the other two boys went out there to a house. I was talking to another fellow there, and a fellow came down there and said a woman had told him I was drunk and he would have to arrest me. I said, 'Well, that is all right.' I stood there with him a minute, and he said to come on, and I said wait until the other boys got there; they were standing there around the house; I could see them, and they came on, and we went on up there. I started on up to Mr. Crawford's house, and they turned around and overtook us as we were going up to Mr. Crawford's; we got in the car and rode on up to Mr. Crawford's and me and Mr. Crawford got out, and when the car started off I jumped in the car, and Mr. Crawford jumped on the running-board and fell off; we went on, and the car was going pretty pert around there; the car sure was going when he fell off; we went on up there and took the first left-hand and went off down there near a branch, and they told me I had better get off; one of them, Tinch, said I had better get off, and he stopped the car. I got out and went over there in the woods and lay down and went to sleep. That evening late I got up and went on up the road to Commerce, and some fellow there in Commerce, policeman, came across the road where I was, and I ask him the way to Homer; after I woke up I was going on home. After I jumped in the car and Mr. Crawford jumped up there on it, he didn't stay on it no time. I saw Tinch reach around Dyer; and Dyer was sorter stooped over when he put his hand around behind. I don't know whether he pushed him off or not; I could not tell you. I reckon that is all I have to say."

J. P. Johnson, recalled, testified he was mayor of Center, that the ordinance of the town (later offered in evidence by the State) was in force at the time of the difficulty, and that the lines with pencil, indelible pencil and red ink, were put in at the time the ordinance was adopted, or at least had been there ever since he be-

came mayor. J. W. Johnson testified that all the interlineations were put in the ordinance at the time it was adopted. The defendant had in his possession $33.45 at the time of his arrest.

Upon conviction the defendant made a motion for new trial on the general grounds, and at the hearing amended the motion by adding the following grounds: (1) Upon the trial the court erred in the following particular: The State offered in evidence what purported to be section fifty of the ordinances of the Town of Center, Ga:, as follows: "Any person who shall be guilty of any disorderly conduct in the Town of Center, or under the influence of whisky calculating to disturb the peace of the citizens, shall, upon conviction, be fined by the mayor in a sum not to exceed one hundred dollars, or work on the streets sixty days, or to be confined in the guard-house not to exceed sixty days, either one or all, in the discretion of the mayor." This ordinance was admitted over objection of defendant on the ground that the same had been interlined with a lead pencil, inserting the words, "or under the influence of whisky," and on the further ground that the same was irrelevant and immaterial, inasmuch as the State had failed to show that a case had been made against the defendant under the same. (2) The court failed and refused to charge the law of voluntary manslaughter, as contained in sections 64, 65, and 66 of the Penal Code of Georgia; the jury, after several hours of deliberation, having requested the court to give them instruction on voluntary manslaughter, and specifically requesting the penalty of voluntary manslaughter, although no specific request for such charge was made during the trial by the defendant. Movant contends the facts in the case required the court to give in charge the law of voluntary manslaughter. (3) One of the jurors who tried the case, Eugene Whitehead, was related within the prohibited degree, being a first cousin of the wife of the deceased, which said fact was not made known to the defendant until long after the trial. The motion for new trial was overruled and error was assigned upon that judgment.

W. W. Starke and J. B. G. Logan, for plaintiff in error.

George M. Napier, attorney-general, P. Cooley, solicitor-general, W. O. Dean, and Seward M. Smith, asst. atty.-gen., contra.

HINES, J. (After stating the foregoing facts.)

1. The trial judge did not err in admitting in evidence the

ordinance of the Town of Center, over objection on the ground that there was a pencil interlineation of the language, " or under the influence of whisky," it being shown that this interlineation was made before the ordinance had been adopted. This interlineation was not an unauthorized ex post facto alteration of this municipal law, but was its birthmark. Nor did the court err in admitting this evidence on the ground that it was irrelevant. It was pertinent to the issue whether the arrest of the defendant by the deceased town marshal was an illegal one which the defendant was justified in resisting, and the right to resist which might reduce the homicide from murder to manslaughter.

2. Did the court err in failing to charge the law of manslaughter? It is urged by counsel for the defendant that the arrest of the defendant by the deceased, who was the marshal of the Town of Center and the constable of the district in which the town is located, was illegal, and the requirement of a cash bond by the mayor was without authority of law; and that a homicide resulting from resistance to such illegal arrest and detention was manslaughter, and not murder. It is true that " Generally to slay a person who, without authority of law, is seeking to make an arrest for a misdemeanor, where the motive of the slayer is merely to avoid an arrest, would be manslaughter and not murder." *Graham* v. *State,* 143 *Ga.* 440, 446 (85 S. E. 328, Ann. Cas. 1917A, 595). But the arrest was not illegal. The town ordinance made it a municipal offense for one to be " under the influence of whisky calculating [calculated?] to disturb the peace of the citizens." It is a State offense for any person to be and appear in an intoxicated condition on any public street or highway. Penal Code (1910), § 442. The defendant was violating this town ordinance and this State statute in the presence of this officer of the law. As town marshal he had the right to arrest the defendant for a violation in his presence of the town ordinance, without a warrant. As a constable he had the right to arrest the defendant for a violation in his presence of the State law, without a warrant. Penal Code (1910), § 917. So the arrest was not illegal because made without a warrant, as the offense was committed in the presence of the arresting officer. So the failure of the trial judge to charge upon the law of manslaughter was not error upon the theory that the arrest was illegal, and that the homicide was committed in resisting such

arrest. If a person kill an officer to prevent the latter from lawfully arresting him in a lawful way, the crime is murder. *Williford* v. *State*, 121 *Ga.* 173 (48 S. E. 962).

Was the omission to charge the law of manslaughter error under the general facts of the case? When the deceased first arrested the defendant, the latter resisted arrest and struck at the officer. After his arrest the officer agreed to take him to the officer's home and keep him there until the other defendants could go to his brother-in-law at Homer and arrange a bond. The other defendants got in an automobile and started on this mission. The defendant jumped in the automobile and started off. The deceased jumped upon the running-board of the car and grabbed at the defendant to prevent his escape. This officer was authorized to use necessary force to prevent the defendant's escape. The defendant struck him twice in the breast with a stick. The deceased leaned over in the car, and the defendant with something in his hand struck the deceased again. The deceased then struck back, but sank and fell from the car unconscious, in which condition he remained until he died. The effort of the deceased to strike the defendant was not made until after the fatal blow was struck. Up to that time the deceased had made no actual assault upon the person of the defendant, had made no attempt to commit a serious personal injury on the defendant; and there were no other equivalent circumstances to justify the existence of passion in the breast of the defendant. Under these circumstances the court did not err in failing to charge the jury the law of manslaughter.

3. There was no evidence to establish the truth of the ground of the motion for new trial that one of the jurors was related within the prohibited degrees to the deceased.

4. There is evidence to support the verdict.

*Judgment affirmed. All the Justices concur.*